1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Christopher T. Holland (SBN 164053)
CHolland@HollandLawLLP.com
Clark A. Waldon (SBN 312696)
CWaldon@HollandLawLLP.com
**HOLLAND LAW LLP**
220 Montgomery Street, Suite 800
San Francisco, CA 94104
Telephone: (415) 200-4980
Fax: (415) 200-4989

*Attorneys for Plaintiffs*
*RetailerX, Inc. d/b/a Pantastic Networks*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RETAILERX, INC. d/b/a PANTASTIC NETWORKS, a Delaware company, and NEIL S. RAFER, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>AIDIN TAVAKKOL, an individual, ESSAN PARTO, an individual, ROBERT JAMES BELL, an individual, PAUL SUMMERVILLE, an individual, DONALD DARRELL COPELAND, an individual, CODECO HOLDINGS LTD., a Canadian company, CHARLES WINOGRAD, an individual, and WINOGRAD CAPITAL LIMITED, a Canadian company.<br><br>Defendants. | Case No.: 23-cv-1705<br><br>**COMPLAINT FOR:**<br><br>1. **FRAUD**<br>2. **NEGLIGENT MISREPRESENTATION**<br>3. **UNFAIR BUSINESS PRACTICES**<br>4. **RESTITUTION/UNJUST ENRICHMENT**<br>5. **CONVERSION**<br>6. **BREACH OF CONTRACT**<br>7. **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**<br>8. **PROMISSORY ESTOPPEL**<br>9. **MONEY HAD AND RECEIVED**<br>10. **DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed: April 6, 2003<br><br>Trial Date: None Assigned |

COMPLAINT

Plaintiffs RetailerX, Inc. d/b/a Pantastic Networks ("Pantastic") and Neil S. Rafer (collectively "Plaintiffs"), by and through their undersigned counsel, for their Complaint against Defendants Aidin Tavakkol, Essan Parto, Robert James Bell, Paul Summerville, Donald Darrell Copeland, Codeco Holdings Ltd., Charles Winograd, and Winograd Capital Limited (collectively "Defendants"), allege as follows:

**INTRODUCTION**

1.      This case is about extensive fraud committed by LimeSpot Solutions Inc.'s ("LimeSpot") founders and/or Chief Executive Officers ("CEOs"), including without limitation Defendants Aidin Tavakkol and Essan Parto.  By filing this lawsuit, Plaintiffs seek, among other things, declaratory and monetary relief against Defendants based on the numerous unlawful acts engaged in by certain Defendants related to their years-long (and ongoing) misrepresentations and/or omissions to Plaintiff Neil S. Rafer, to his e-commerce company Plaintiff Pantastic, and to multiple investors and others in connection with LimeSpot's supposedly "state of the art" neural network, machine learning, and/or deep learning[1] technological capabilities over a period spanning approximately seven (7) years.

2.      Beginning with the very first time Mr. Rafer met Defendant Aidin Tavakkol in 2016 and discussed the e-commerce industry and related technology, Mr. Tavakkol explicitly told Mr. Rafer that the core of his company LimeSpot was centered around its machine and deep learning technology that was revolutionizing online marketplaces and, unlike its competitors, contained a system of neural networks that allowed its platform to analyze large sets of data and function and learn in an automated manner without any manual human input and/or adjustment.

3.      From that day forward, Defendant Tavakkol (and later Defendant Parto) continued to consistently make similar representations and/or omissions regarding LimeSpot's technology over and

---

[1]      "Machine learning" and "deep learning" are terms describing artificial intelligence that are sometimes used interchangeably, and deep learning is also considered by some to be a type of machine learning.  Regardless of the terminology used, Defendants' claims regarding LimeSpot's technology were consistent: that it utilized a system of neural networks and could analyze large sets of data and function and learn in an automated manner without any manual human input and/or adjustment.

COMPLAINT

over to Mr. Rafer, who had also told Defendant Tavakkol that he was actively looking to build an e-commerce advisory practice and portfolio focused on the type of machine and deep learning technology described above.

4.      Defendant Tavakkol continued to do whatever he could to establish a relationship with Mr. Rafer and become close with him in light of Mr. Rafer's multiple decades of experience and well-established reputation in the industry.  Defendant Tavakkol then hired Mr. Rafer as a consultant and utilized Mr. Rafer's know-how, advice, and wealth of connections to more skillfully pitch LimeSpot's purported industry-leading technology to investors and other companies and prospective customers, many of whom were introduced to Defendant Tavakkol through Mr. Rafer and his network.

5.      Eventually Mr. Rafer helped form Pantastic, his own e-commerce brainchild.  After getting his company up and running, Mr. Rafer recalled his extensive discussions and correspondence with Defendants Tavakkol and Parto, and came to believe as a direct result of Defendants' lies that the neural network and machine and deep learning technology which LimeSpot allegedly possessed would help take his company to the next level and benefit independent brands on Pantastic's e-commerce platform by targeting and attracting additional customers and purchases.

6.      Mr. Rafer's reliance on Defendants Tavakkol's and Parto's prior misrepresentations and/or omissions about LimeSpot's capabilities led to discussions with Defendants Tavakkol and Parto along with others at LimeSpot in 2020 regarding the potential purchase of LimeSpot so that Pantastic could utilize the neural network and machine and deep learning technology that LimeSpot had been touting for many years.  Throughout the entire due diligence and negotiation process, Defendants Tavakkol and Parto never wavered in promoting the fictional reality of their supposed neural network and machine and deep learning expertise, and alleged revolutionary technology, and as a direct and proximate result of those demonstrably false statements and/or omissions by those Defendants, eventually the parties entered into agreements related to Pantastic's purchase of LimeSpot in 2022.

7.      Only after that acquisition, and once the Pantastic team began working with Defendants Tavakkol, Parto, and others on the LimeSpot team to complete a series of tasks to begin integrating LimeSpot's technology into Pantastic's platform, did Plaintiffs begin to uncover that apparently the technology which Defendants had claimed they had for over seven (7) years **never existed**.  To the

contrary, LimeSpot's technology did not include the promised artificial intelligence, machine learning, and deep learning capabilities that consisted of a system of neural networks and could analyze large sets of data and function and learn in an automated manner that did not require manual human input and/or adjustment to function.  It was in fact an utter failure because numerous and frequent human input was constantly required and no neural networks existed, thus negating the entire alleged value of LimeSpot and its purported "technology."

8.     To make matters worse, Defendants Tavakkol and Parto actively tried to hide LimeSpot's lack of neural network use, machine learning, and/or deep learning technology from Plaintiffs.  For example, whenever Plaintiffs specifically asked Defendants Tavakkol and Parto about LimeSpot's purported neural networks and/or suggested making modifications to and/or re-platforming it, those Defendants would strongly push back on Plaintiffs' proposals instead of admitting that no neural networks actually existed in the first place.

9.     Despite those shocking discoveries, Plaintiffs still attempted in good faith to work with Defendants for approximately six (6) months to come up with an alternative solution that would at least allow Pantastic to obtain some value from LimeSpot's technology, although still nothing close to the essential capabilities repeatedly promised.  But when generously presented with multiple second chances to fix the problem, use their alleged "expertise" to get the software working as promised, and/or otherwise deliver as they had long said they would, Defendants refused to meaningfully engage with Plaintiffs.  Apparently, Defendants believed their fraud was a fait accompli after the acquisition, and that Plaintiffs had no recourse against the years of lies engaged in by Defendants Tavakkol and Parto regarding their company.

10.     Thus, Plaintiffs had no choice but to file this action seeking declaratory relief and money damages related to Defendants' myriad of wrongful acts, including certain Defendants' fraudulent misrepresentations, omissions, and other tortious misconduct concerning LimeSpot's technological capabilities, and alternative damage claims related to certain contracts made in connection with Pantastic's purchase of LimeSpot (although Plaintiffs maintain those contracts are invalid and unenforceable including because they are wholly tainted by fraud).  Therefore, as set

forth in more detail below, Plaintiffs seek all such applicable damages, as well as litigation costs, investigative costs, prejudgment and post-judgment interest, attorneys' fees, and punitive damages.

**THE PARTIES**

11.     Plaintiff RetailerX, Inc. d/b/a Pantastic Networks is a Delaware company, having its principal place of business at 555 Bryant St. #449, Palo Alto, California 94301.

12.     Plaintiff Neil S. Rafer is an individual who resides in San Francisco, California and is a co-founder and CEO of Plaintiff Pantastic.

13.     On information and belief, Defendant Aidin Tavakkol, a founder and former CEO of LimeSpot and an individual shareholder who benefited from the sale of LimeSpot to Pantastic, is a Canadian citizen who Plaintiffs believe in good faith may be located for service of process at 403-1409 W. Pender Street, Vancouver, British Columbia V6G 2S3, Canada.

14.     On information and belief, Defendant Essan Parto, a founder and former Chief Technology Officer ("CTO") of LimeSpot and an individual shareholder who benefited from the sale of LimeSpot to Pantastic, is a Canadian citizen who Plaintiffs believe in good faith may be located for service of process at 21572 126 Avenue, Maple Ridge, British Columbia, V4R 2G9, Canada.

15.     On information and belief, Defendant Robert James Bell, a former CEO and Chairman of LimeSpot and an individual shareholder who benefited from the sale of LimeSpot to Pantastic, is a Canadian citizen who Plaintiffs believe in good faith may be located for service of process at 4407 Robinwood Drive, Victoria, British Columbia, V8N 5R7, Canada.

16.     On information and belief, Defendant Paul Summerville, a founder and former CEO of LimeSpot and an individual shareholder who benefited from the sale of LimeSpot to Pantastic, is a Canadian citizen who Plaintiffs believe in good faith may be located for service of process at B-3594 Goldspur Road, Victoria, British Columbia, V9C0K5, Canada.

17.     On information and belief, Defendant Donald Darrell Copeland, an individual shareholder who benefited from the sale of LimeSpot to Pantastic, is a Canadian citizen who Plaintiffs believe in good faith may be located for service of process at 1216 Belavista Crescent SW, Calgary, Alberta, T2V2B1, Canada.

COMPLAINT

18.     On information and belief, Defendant Codeco Holdings Ltd. is a Canadian company and shareholder that benefited from the sale of LimeSpot to Pantastic, and who Plaintiffs believe in good faith has its principal place of business at 1216 Belavista Crescent SW, Calgary, Alberta, T2V2B1, Canada.

19.     On information and belief, Defendant Charles Winograd, an individual shareholder who benefited from the sale of LimeSpot to Pantastic, is a Canadian citizen who Plaintiffs believe in good faith may be located for service of process at 115 Joicey Boulevard, Toronto, Ontartio, M5M 2T7, Canada.

20.     On information and belief, Defendant Winograd Capital Limited is a Canadian company and shareholder that benefited from the sale of LimeSpot to Pantastic, and who Plaintiffs believe in good faith has its principal place of business at 115 Joicey Boulevard, Toronto, Ontartio, M5M 2T7, Canada.

## JURISDICTION AND VENUE

21.     This action is brought on the various grounds and pursuant to the various statutes cited herein, including, but not limited to: the Declaratory Judgments Act (28 U.S.C. §§ 2201(a) and 2202); California Code of Civil Procedure § 1060 (declaratory relief); California Civil Code §§ 1709, 1710 and 1572 (fraud), 1710(2) (negligent misrepresentation), and 1549-1624, 3300-3301, 3360 (breach of contract), California Business and Professions Code § 17200 et seq. (unfair business practices), as well as common and/or case law prohibitions against fraud, negligent misrepresentation, restitution and/or unjust enrichment, conversion, unfair business practices, breach of fiduciary duty, breach of contract, breach of covenant of good faith and fair dealing, promissory estoppel, and money had and received.

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because this action is between citizens of a State and citizens or subjects of a foreign state, and, on information and belief, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     This Court also has jurisdiction with respect to the declaratory judgment cause of action below under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

24.     Additionally, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a)

COMPLAINT

over Plaintiffs' claims arising under state law because these claims are so related to their claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

25.   This Court has personal jurisdiction over Defendants for multiple reasons, including, but not limited to because: (i) Defendants committed torts against Plaintiffs and other investors located in California, that were purposefully calculated to and did in fact cause harmful effects felt in California; (ii) Defendants have repeatedly and purposefully availed themselves of the privilege of conducting various activities, including doing business, within the state of California, including within this Judicial District; and (iii) a substantial part of the events giving rise to Plaintiffs' claims and harms occurred in California.  Specifically, Defendants made fraudulent misrepresentations and/or omissions to Pantastic, a company with its primary place of business in California, and other investors located in California, and caused harm to Plaintiffs, the brunt of which was suffered – and which Defendants knew would likely be suffered – in California.  Certain Defendants, including but not limited to Defendant Tavakkol, also made many of those fraudulent misrepresentations and/or omissions while in the state of California.  Defendants further solicited investments and/or consummated multiple business transactions with California residents, corporations, and/or other entities.

26.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims are located in this judicial district, where Plaintiff Pantastic has its principal place of business and transacts business and where Plaintiff Rafer resides, and because Defendants are all Canadian residents and therefore may be sued in any judicial district.

## **DIVISIONAL ASSIGNMENT**

27.   Pursuant to this Court's Civil Local Rules 3-5(b) and 3-2(d), this action may be properly assigned to the San Francisco Division because a substantial part of the events giving rise to the claims asserted herein occurred in San Francisco County, California.

## GENERAL ALLEGATIONS

28.     Plaintiff Pantastic is an e-commerce company that provides an online shopping platform for independent brands and offers small business owners the technological capabilities necessary to grow and scale their businesses and compete with other companies in the market.

29.     Plaintiff Neil S. Rafer is the CEO and a co-founder of Pantastic, which was created on or around April of 2020.  Mr. Rafer has over twenty (20) years of experience running software startups. Before Pantastic, he helped found other companies such as Lumatic, Lookery, Mashery, and Cloudery and has served as the CEO or Director of those companies along with many others, including without limitation MyBlogLog, Nanigans, Zemanta, and ShopPad Inc.

30.     Mr. Rafer and Defendants' relationship began well before Mr. Rafer created Pantastic. At the beginning of 2016, "deep learning" technology was gaining prominence in the industry – machine learning that, at a high-level, uses a "neural network" modeled after the human brain and consists of multiple layers of algorithms and computing units used to analyze large sets of data and enables a machine to function and learn in an automated manner without any manual human input and/or adjustment.  Foreseeing the upcoming dominance of machine and deep learning in the industry, Mr. Rafer made the decision to focus his time and resources on building an e-commerce supply chain advisory practice and portfolio focused on those deep learning capabilities.

31.     A few months later, Mr. Rafer was first introduced to Defendant Tavakkol, who at that time was the CTO of LimeSpot.  After that introduction, Mr. Rafer and Defendant Tavakkol had an initial in-person meeting on or around April 19, 2016.  At that meeting, among other things, the parties discussed machine learning, and specifically deep learning and neural networks, which Defendant Tavakkol represented, unlike its competitors, was at the core of LimeSpot's business strategy and technology.

32.     On or around May 26, 2016, Mr. Rafer met with Defendant Tavakkol again in person, and Defendant Tavakkol proceeded to show him a LimeSpot investment pitch deck and again discussed LimeSpot's neural network and machine and deep learning capabilities.  Later, Defendant Tavakkol followed up with an email that included the same pitch deck and an additional LimeSpot sales pitch presentation for Mr. Rafer's review.

8

33.     Subsequently, the parties continued with additional informal meetings and conversations, including regarding LimeSpot's purported technology and Mr. Rafer's multitude of connections to investors and other companies in the e-commerce industry to whom he could introduce Defendant Tavakkol.  Each and every time, Defendant Tavakkol represented that LimeSpot had and was continuing to build machine and deep learning technology that included a system of neural networks.

34.     The relationship between Defendant Tavakkol and Mr. Rafer continued to develop, and on or around July 25, 2016 the two (2) parties met again in person to discuss the functionality of LimeSpot's neural network and machine and deep learning technology as well as strategy with respect to securing investments for LimeSpot.  Shortly thereafter, on or around August 2, 2016, Defendant Tavakkol sent Mr. Rafer another LimeSpot investment pitch deck for review in preparation for an additional upcoming meeting.

35.     On or around September 1, 2016, Mr. Rafer formally contracted with LimeSpot to serve as an advisor through his consulting company Cloudery, LLC ("Cloudery").  That same month, Defendant Tavakkol became the CEO of LimeSpot, taking over the position from Defendant Robert Bell, who transitioned into a role as LimeSpot's Chairman.

36.     On or around September 8, 2016, Defendant Tavakkol sent Mr. Rafer an email with a "blurb" about LimeSpot, which without limitation included a hyperlink to the LimeSpot website at www.limespot.com ("LimeSpot Website") along with the following representations about the company and its technology:

- "Our patent-pending technology uses linguistic analysis and machine learning to understand content and target it intelligently"; and

- "By combining that with the power of profile information (i.e. social network, CRM, loyalty programs, etc.), along with behavioral and trend analysis, LimeSpot is able to instantly make highly relevant recommendations for each consumer".

37.     Mr. Rafer, along with investors, and later on personnel at Pantastic, periodically reviewed the publicly available LimeSpot Website.   A true and correct copy of an exemplary

COMPLAINT

September 2, 2016 screenshot of the LimeSpot Website, captured by the internet archive at web.archive.org ("Internet Archive"), is attached hereto as Exhibit A (emphasis added).

38.    The LimeSpot Website included without limitation the following flow chart graphic representing its technological capabilities, which purports to consist of the neural network and machine and deep learning functions represented by Defendant Tavakkol (Ex. A at p. 1):



39.    The LimeSpot Website also included without limitation the following representations explaining the flow chart graphic and describing the company and its technology:

- "Our patent-pending technology uses linguistic analysis and machine learning to understand content and target it intelligently." (Ex. A at p. 2);

- "By working with small businesses, our engine gets exposed to a large, diverse array of content and behavior – and uses machine learning to make itself smarter from it." (Ex. A at p. 2);

- "LimeSpot technology uses linguistic analysis and machine learning to automatically extract the attributes and target audience – in terms of demographics and interests – for

COMPLAINT

each specific piece of content.  Our technology also identifies the relationship between

products." (Ex. A at p. 3); and

- "Our engine uses linguistic analysis and machine learning to understand how content

is related, and it deciphers behavior patterns to determine what visitors want." (Ex. A

at p. 5).

40.     Further, the LimeSpot Website contained a link to a website for its publicly available

application programming interface ("API") open platform website at http://personalizer.io

("Personalizer Website"), which Mr. Rafer, investors, and later on personnel at Pantastic, reviewed

from time to time.  A true and correct copy of an exemplary October 29, 2016 screenshot of the

Personalizer Website, captured by the Internet Archive, is attached hereto as Exhibit B (emphasis

added).

41.     LimeSpot's  Personalizer  Website  included  without  limitation  the  following

representation about the company and its technology:

- "The  engine  behind  personalizer.io  is  powered  by  advanced  machine  learning

algorithms combined with linguistic analysis." (Ex. B at p. 1).

42.     From September 2016 onward, Mr. Rafer continued to consult with Defendants

Tavakkol and Parto, and others at LimeSpot, who repeatedly represented to him without limitation

through emails, messages, pitch decks, telephone calls, and in-person meetings, that LimeSpot's

technology included certain artificial intelligence, machine learning, and deep learning capabilities

that utilized LimeSpot's system of neural networks and were automated and able to function without

any human intervention or manual adjustments.

43.     LimeSpot's aforementioned pitch decks and related scripts that Defendants created

and presented to Plaintiffs, investors, and prospective customers including from at least in 2015

onward contained similar graphic and textual representations as the LimeSpot Website, including but

not limited to that:

- LimeSpot's technology is different from competitors, who only offer "a manual mix

of technology and human intervention";

- LimeSpot's implementation has "deep personalization";

COMPLAINT

- LimeSpot's "patent-pending technology" and "core IP" is powered by "machine learning" and "artificial intelligence";

- "AI . . . [is] being automated and taken over by learning systems . . . we've been a part of it for the past 4 years";

- "Most importantly we wanted to build a global network effect for our AI brain"; and

- "[T]he chart clearly shows the network effect, and how the machine is learning and doing a better job."

44.     Defendant Tavakkol also made statements to Mr. Rafer regarding LimeSpot's abilities related to the future development of artificial intelligence technology, including without limitation and by way of example only in an October 19, 2016 email, that "[e]ven if something is not available today, we can easily and quickly add new endpoint sand processors to deliver whatever we want."

45.     Although on information and belief Defendants occasionally updated the LimeSpot Website and Personalizer Website to make changes such as modernizing its appearance, Defendants kept the flow chart graphic from 2016 representing LimeSpot's technological capabilities front and center.  In doing so, as shown below, Defendants replaced the "machine learning" text with a graphic of a brain containing a system of the neural networks that Defendants Tavakkol and Parto consistently represented existed and which on information and belief represent the multiple layers of algorithms and computing units only utilized in machine and deep learning technology.  A true and correct copy of an exemplary June 25, 2018 screenshot of the LimeSpot Website, captured by the Internet Archive, is attached hereto as Exhibit C.



COMPLAINT

46.     In fact, Defendants expressly explained on the "Technology" page of the LimeSpot Website that the brain graphic represents a machine and deep learning system: one that "optimizes without human intervention."

47.     As yet another example, on or around April 9, 2017 Defendant Tavakkol forwarded Mr. Rafer an email thread between Defendant Tavakkol and ████████████████ – a potential investor to whom Mr. Rafer introduced him – containing representations regarding LimeSpot's purported machine and/or deep learning technology that utilizes a system of neural networks.  A true and correct copy of the April 9, 2017 email thread is attached hereto as Exhibit D (highlights added).

48.     More specifically, Defendant Tavakkol made the following representations on April 2, 2017:

- **"LimeSpot is a system of neural networks**" (Ex. D at p. 2) (emphasis added);
- "In our case, the system grows and evolves and makes marketing choices automatically – the AI learns and is always optimizing" (*Id.*);
- "An important part of the Limestore (to be built) is an automated ad engine to use the above data to target shoppers on ads and apply machine-learning to further optimize for the lowest CAC" (*Id.*); and
- Unlike LimeSpot, the system of its competitor BlueKai "doesn't learn or evolve.  Its entire function is to . . . manually understand shoppers." (*Id.*).

49.     Defendants Tavakkol's and Parto's representations to Mr. Rafer, investors, other companies, and prospective customers regarding LimeSpot's automated artificial intelligence, machine learning, and deep learning technology that utilized LimeSpot's system of neural networks and in no way relied on manual human input or adjustment continued in written and oral communications, including but not limited to in person, emails and online chats, telephone and videoconferences, webpages, blog posts, investor updates, slide decks and presentations, and marketing and promotional materials up until the date of this Complaint.

50.     Additionally, Defendants Tavakkol and Parto often: (1) compared LimeSpot's technology to that of other companies that had neural networks and machine and deep learning

1    capabilities or were working on developing machine and deep learning technology; and (2)

2    differentiated LimeSpot from its competitors, many of which Defendants claimed did not use neural

3    networks and only offered technology that required manual and human intervention, and therefore

4    was not automated or capable of teaching itself or learning on its own.

5        51.    On or around April of 2020, Mr. Rafer helped found Pantastic – his own e-commerce

6    company for independent brands – in furtherance of his ongoing mission to build a machine and

7    deep learning focused e-commerce supply chain advisory practice and portfolio.

8        52.    Due to Defendants Tavakkol's and Parto's many ongoing and consistent

9    technological representations, Plaintiffs felt confident in LimeSpot's future success as an e-

10   commerce company because of its purported neural network and machine and deep learning

11   capabilities.  Therefore, Plaintiffs helped Defendants and LimeSpot recruit employees, invested in

12   LimeSpot, and also convinced other individuals and companies in their personal network to do the

13   same.

14       53.    That same year, and following an approximately four (4)-year period consisting of

15   numerous exchanges regarding LimeSpot's neural network and machine and deep learning

16   capabilities, Defendants and Plaintiffs Pantastic and Rafer engaged in discussions regarding

17   Pantastic's prospective purchase of LimeSpot and its underlying technology.

18       54.    As part of those preliminary discussions, Defendants Tavakkol and Parto and other

19   LimeSpot employees continued to represent to Plaintiffs that LimeSpot's technology included without

20   limitation artificial intelligence, machine learning, and deep learning capabilities that utilized

21   LimeSpot's system of neural networks – which were superior to and would outperform any competitor

22   or open-source neural networks – and were automated and did not require manual human input and/or

23   adjustment to function.  Defendants Tavakkol and Parto and other LimeSpot employees continued to

24   make such representations orally, in various written and electronic communications, and in other

25   documents and materials on numerous occasions, including but not limited to during further ongoing

26   discussions regarding Pantastic's acquisition of LimeSpot, during discussions with investors, in the

27   language included in a Share Purchase Agreement ("SPA") related to the sale of LimeSpot to Pantastic

28   on or around June 25, 2022 and other documents related to the execution of same, and after Pantastic,

_____

Defendants, LimeSpot and other Shareholder Parties[2] entered into the SPA on or around June 25, 2022.  A true and correct copy of the SPA is attached hereto as Exhibit E.

55.     Around the same time that Pantastic acquired LimeSpot, Pantastic also entered into an Incentive Plan Agreement ("Incentive Plan") including with Defendants Tavakkol and Parto that also contained similar representations regarding LimeSpot's technology.  A true and correct copy of the Incentive Plan is attached hereto as Exhibit F.

56.     The technological capabilities that Defendants Tavakkol and Parto represented existed were critical and material to Pantastic's decision to purchase LimeSpot and enter into the SPA and Incentive Plan.  Plaintiffs were specifically in need of an automated machine and deep learning system utilizing a system of neural networks that they could incorporate into Pantastic's e-commerce platform so that its independent customers running small businesses could use the technology to assist in analyzing consumer behavior and target and acquire additional customers of their own.

57.     In addition to an upfront purchase payment, the SPA and Exhibit F thereto also provided for an Earn Out Payment to be made by Pantastic if, and only if, a set of specific and material Tasks making up the Earn Out Criteria was substantially completed within the specified Earn Out Period, which originally ran from on or around July 7, 2022 to on or around November 4, 2022.  Those Tasks were related to integrating LimeSpot's neural network and machine and deep learning technology into Pantastic's e-commerce platform.

58.     To their shock and surprise, Plaintiffs began to uncover for the first time during the Earn Out Period in the fall of 2022 that the representations made by Defendants Tavakkol and Parto regarding LimeSpot's technological capabilities and other data and information related to same were completely false.   Contrary to the assertions made by Defendants Tavakkol and Parto for approximately seven (7) years, LimeSpot did not utilize, develop, or otherwise know how to work with the promised neural network and machine and deep learning technology, and actually required constant human adjustments for its recommendation system to function properly rather than utilizing

---

[2]     As used in this Complaint, unless otherwise defined, capitalized terms have the respective meanings set out in the SPA.

COMPLAINT

algorithms that adjust automatically on the basis of a training data set.  This defeated the entire purpose of Pantastic's acquisition of LimeSpot and in no way reflects the artificial intelligence, machine learning, and deep learning technology utilizing a system of neural networks that was repeatedly promised to Pantastic.

59.     To make matters worse, Defendants Tavakkol and Parto actively tried to hide their lack of neural network use, machine learning, and/or deep learning technology from Plaintiffs at all costs. For example, whenever Plaintiffs specifically asked Defendants Tavakkol and Parto about LimeSpot's purported neural networks and/or suggested making modifications to and/or re-platforming it, Defendants would strongly push back on Plaintiffs' proposals instead of coming clean and admitting that no neural networks actually existed in the first place.  Rather, Defendants Tavakkol and Parto would continue making blatantly false assertions that LimeSpot's system of neural networks was superior to and would outperform any competitor or open-source neural networks.

60.     Beginning on or around September of 2022, and only after Plaintiffs continually pressed, prodded, and investigated the issue, did employees at LimeSpot finally start to admit that LimeSpot did not have even a single neural network, let alone a system of neural networks, and that LimeSpot's technology instead required manual human input and/or adjustment to function and could not learn in an automated manner.

61.     Due to Defendants Tavakkol's and Parto's ongoing and materially false misrepresentations and/or omissions that permeated the entire purpose of Pantastic's acquisition of LimeSpot, which induced Plaintiffs and others to invest in LimeSpot and induced Pantastic to enter into the SPA and Incentive Plan, the SPA and Incentive Plan never legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable.

62.     However, even if the SPA and/or Incentive Plan were somehow valid and/or enforceable, separate from the material misrepresentations and/or omissions, LimeSpot also failed to substantially complete the Earn Out Criteria specified by the SPA.  Due to LimeSpot's inability to complete numerous Tasks despite a first extension to November 30, 2022 and thereafter a second extension to December 14, 2022, and its failure to provide a machine and deep learning system as

promised that used a model that utilized a system of neural networks and did not require numerous and frequent human input and/or adjustments, the Earn Out Milestone was not achieved.

63.     Specifically, LimeSpot failed to substantially complete at least eight (8) of the twenty-two (22) discrete Tasks that make up the Earn Out Criteria pursuant to § 2.4 and Exhibit F to the SPA, including without limitation Tasks 2.1, 2.5, 2.6, 2.7, 2.8, 3.4, 3.5, and 3.6 – which were major and critical Tasks – despite extensive and detailed written explanations and feedback by Pantastic regarding why those Tasks had not been accepted and access to numerous Pantastic personnel made available during the Earn Out Period to assist in the management, completion, and review of the Tasks.

64.     LimeSpot also failed to work in good faith to facilitate the progression on the Earn Out Milestone in accordance with Exhibit F to the SPA, including but not limited to by refusing to work cooperatively with Pantastic, failing to respond to Pantastic's requests and comments, and refusing to listen to Pantastic's feedback and instructions.

65.     Moreover, LimeSpot did not comply with all of the specific procedures for submitting Tasks for approval by Pantastic and/or escalating rejected Tasks that LimeSpot believed should have been accepted pursuant to Exhibit F of the SPA.

66.     Even despite the persistent fraudulent misrepresentations and/or omissions made to both Pantastic and investors that were material to the decision to acquire and finance LimeSpot, and LimeSpot's failure to complete the Earn Out Criteria, Pantastic consistently attempted to work with Defendants in good faith from October 2022 through now, even after expiration of the Earn Out Period, in an attempt to negotiate and revise the Earn Out Criteria in a way that would at least allow Pantastic to obtain some value from LimeSpot's technology – albeit not the essential capabilities repeatedly promised – and conversely would allow Defendants to be compensated as provided in the SPA and Incentive Plan.  To date, Pantastic's good faith efforts over the past six (6) months have not been fruitful and Defendants have not meaningfully engaged with Plaintiffs Pantastic and Rafer to address the rejected Tasks and other concerns raised by Plaintiffs.

67.     Pursuant to at least Section 6.2(a)(i)-(ii) and (vi) and Section 6.2(b) of the SPA, Defendants agreed ███████████████████████████████████████████████
████████████████████████████████████████████████

17

COMPLAINT

68.     Pantastic has already paid approximately ███████████ as an upfront payment to purchase LimeSpot pursuant to § 2.2 of the SPA despite the fact that the entire SPA was a product of fraud and/or coercion.  Pantastic has also suffered other harm, including without limitation injury to business and reputation.

69.     Mr. Rafer also invested in LimeSpot as a direct result of Defendants Tavakkol's and Parto's fraud and/or coercion and their other aforementioned acts.  Further, Mr. Rafer has suffered other harm, including but not limited to injury to business and reputation due to his promotion of Defendants Tavakkol and Parto and their company LimeSpot to investors and other personal and business connections in the e-commerce industry.

## FIRST CAUSE OF ACTION

### Fraud

### (Against Defendants Tavakkol and Parto)

70.     Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action. Any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

71.     As set forth above, Defendants Aidin Tavakkol and Essan Parto failed to disclose important facts and/or made numerous oral and written representations to Plaintiffs in initial personal and business conversations, during further discussions regarding Pantastic's acquisition of LimeSpot, during discussions with investors, in the language included in the SPA and Incentive Plan, and after Pantastic, Defendants, LimeSpot, and other Shareholder Parties entered into the SPA and Incentive Plan.

72.     Those representations and/or omissions started at least as early as 2016, were ongoing, and were made orally, in various written and electronic communications, and in other documents and materials, including without limitation through in-person meetings, pitch decks, emails, messages, online chats, telephone calls and videoconferences, webpages, blog posts, investor updates, presentations, and marketing and promotional materials.

73.     The representations and/or omissions include but are not limited to statements regarding LimeSpot's promised technology, which Plaintiffs were assured on numerous occasions

18

COMPLAINT

including by Defendants Tavakkol and Parto over an approximately seven (7) year period consisted of artificial intelligence, machine learning, and deep learning capabilities that utilized a system of neural networks and were automated and did not require human input and/or adjustment. Defendants Tavakkol and Parto also misrepresented and/or omitted other data and information related to LimeSpot's technology.

74. More specifically, examples of Defendants Tavakkol's and Parto's misrepresentations included but were not necessarily limited to the following and/or similar statements on the LimeSpot Website and Personalizer Website and graphics conveying the same, which were also made by Defendants Tavakkol and Parto on other occasions in writing and/or orally, and which were not true:

- "Our patent-pending technology uses linguistic analysis and machine learning to understand content and target it intelligently";
- "By working with small businesses, our engine gets exposed to a large, diverse array of content and behavior – and uses machine learning to make itself smarter from it";
- "LimeSpot technology uses linguistic analysis and machine learning to automatically extract the attributes and target audience – in terms of demographics and interests – for each specific piece of content. Our technology also identifies the relationship between products";
- "Our engine uses linguistic analysis and machine learning to understand how content is related, and it deciphers behavior patterns to determine what visitors want"; and
- The LimeSpot technology "optimizes without human intervention."

75. Additionally, other examples of Defendants Tavakkol's and Parto's misrepresentations included but were not necessarily limited to the following and/or similar statements in LimeSpot's pitch decks and related scripts and graphics conveying the same, which were also made by Defendants Tavakkol and Parto on other occasions in writing and/or orally, and which were not true:

- LimeSpot's technology is different from competitors, who only offer "a manual mix of technology and human intervention";
- LimeSpot's implementation has "deep personalization";

COMPLAINT

- LimeSpot's "patent-pending technology" and "core IP" is powered by "machine learning" and "artificial intelligence";
- "AI . . . [is] being automated and taken over by learning systems . . . we've been a part of it for the past 4 years";
- "Most importantly we wanted to build a global network effect for our AI brain"; and
- "[T]he chart clearly shows the network effect, and how the machine is learning and doing a better job."

76.   Other examples of Defendants Tavakkol's and Parto's misrepresentations included but were not necessarily limited to the following and/or similar statements in emails that Defendants Tavakkol and Parto and other LimeSpot employees sent to Plaintiffs, which were also made by Defendants Tavakkol and Parto and additional LimeSpot employees on other occasions in writing and/or orally, and which were not true:

- "Our patent-pending technology uses linguistic analysis and machine learning to understand content and target it intelligently";
- "By combining that with the power of profile information (i.e. social network, CRM, loyalty programs, etc.), along with behavioral and trend analysis, LimeSpot is able to instantly make highly relevant recommendations for each consumer"; and
- "[e]ven if something is not available today, we can easily and quickly add new endpoint sand processors to deliver whatever we want."

77.   Further examples of Defendants Tavakkol's and Parto's misrepresentations included but were not necessarily limited to the following and/or similar statements in an April 2017 email thread that Defendant Tavakkol sent to Plaintiff Rafer, which were also made by Defendants Tavakkol and Parto and additional LimeSpot employees on other occasions in writing and/or orally, and which were not true:

- "LimeSpot is a system of neural networks";
- "In our case, the system grows and evolves and makes marketing choices automatically – the AI learns and is always optimizing";

---

- "An important part of the Limestore (to be built) is an automated ad engine to use the above data to target shoppers on ads and apply machine-learning to further optimize for the lowest CAC"; and

- Unlike LimeSpot, the system of its competitor BlueKai "doesn't learn or evolve. Its entire function is to . . . manually understand shoppers".

78. Moreover, with respect to specific examples of Defendants Tavakkol's and Parto's omissions, Defendants Tavakkol and Parto actively hid LimeSpot's lack of neural network use, machine learning, and/or deep learning technology from Plaintiffs at all costs. For instance, whenever Plaintiffs specifically asked Defendants Tavakkol and Parto about LimeSpot's purported neural networks and/or suggested making modifications to and/or re-platforming it, Defendants would strongly push back on Plaintiffs' proposals instead of coming clean and admitting that no neural networks actually existed in the first place. Rather, Defendants Tavakkol and Parto would continue to misrepresent that LimeSpot's system of neural networks was superior to and would outperform any competitor or open-source neural networks.

79. The representations made by Defendants Tavakkol and Parto were false and the facts omitted by Defendants Tavakkol and Parto were important.

80. Defendants Tavakkol and Parto knew that the representations were false and/or that their omissions were important when they made them, and/or they made the representations and/or omissions recklessly and without regard for their truth.

81. Defendants Tavakkol and Parto intended that Mr. Rafer, Pantastic, and various investors rely on those representations and/or omissions in financing and entering into the SPA and Incentive Plan related to the purchase of LimeSpot, and intended to induce Plaintiffs and investors into such action.

82. Plaintiffs and various investors reasonably relied on those material representations and/or omissions, which were the central purpose of Plaintiffs' investment in and acquisition of LimeSpot.

83. Plaintiffs' reliance on the representations and/or omissions was a substantial factor in causing Plaintiffs' harm.

_____

84.     As a direct and proximate result of those fraudulent misrepresentations and/or omissions from the very outset of the parties' relationship – including but not limited to throughout the negotiations which led to the SPA and Incentive Plan – those entire agreements never legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable.

85.     Plaintiffs were harmed in an amount to be proven at trial and are entitled to damages including but not limited to the approximately ████████████ Pantastic already paid for the purchase of LimeSpot and all other actual, compensatory, and punitive damages.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

### (Against Defendants Tavakkol and Parto)

86.     Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action.  Any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

87.     As set forth above, Defendants Aidin Tavakkol and Essan Parto failed to disclose important facts and/or made numerous oral and written representations to Plaintiffs in initial business conversations, during further discussions regarding Pantastic's acquisition of LimeSpot, during discussions with investors, in the language included in the SPA and Incentive Plan, and after Pantastic, Defendants, LimeSpot, and other Shareholder Parties entered into the SPA and Incentive Plan.

88.     Those representations and/or omissions started at least as early as 2016, were ongoing, and were made orally, in various written and electronic communications, and in other documents and materials, including without limitation through in-person meetings, pitch decks, emails, messages, online chats, telephone calls and videoconferences, webpages, blog posts, investor updates, presentations, and marketing and promotional materials.

89.     The representations and/or omissions include but are not limited to statements regarding LimeSpot's promised technology, which Plaintiffs were assured on numerous occasions including by Defendants Tavakkol and Parto over an approximately seven (7) year period consisted of artificial intelligence, machine learning, and deep learning capabilities that utilized a system of neural networks and were automated and did not require human input and/or adjustment.  Defendants

Tavakkol and Parto also misrepresented and/or omitted other data and information related to LimeSpot's technology.

90.     More specifically, examples of Defendants Tavakkol's and Parto's misrepresentations included but were not necessarily limited to the following and/or similar statements on the LimeSpot Website and Personalizer Website and graphics conveying the same, which were also made by Defendants Tavakkol and Parto on other occasions in writing and/or orally, and which were not true:

- "Our patent-pending technology uses linguistic analysis and machine learning to understand content and target it intelligently";
- "By working with small businesses, our engine gets exposed to a large, diverse array of content and behavior – and uses machine learning to make itself smarter from it";
- "LimeSpot technology uses linguistic analysis and machine learning to automatically extract the attributes and target audience – in terms of demographics and interests – for each specific piece of content.  Our technology also identifies the relationship between products";
- "Our engine uses linguistic analysis and machine learning to understand how content is related, and it deciphers behavior patterns to determine what visitors want"; and
- The LimeSpot technology "optimizes without human intervention."

91.     Additionally, other examples of Defendants Tavakkol's and Parto's misrepresentations included but were not necessarily limited to the following and/or similar statements in LimeSpot's pitch decks and related scripts and graphics conveying the same, which were also made by Defendants Tavakkol and Parto on other occasions in writing and/or orally, and which were not true:

- LimeSpot's technology is different from competitors, who only offer "a manual mix of technology and human intervention";
- LimeSpot's implementation has "deep personalization";
- LimeSpot's "patent-pending technology" and "core IP" is powered by "machine learning" and "artificial intelligence";
- "AI . . . [is] being automated and taken over by learning systems . . . we've been a part of it for the past 4 years";

COMPLAINT

- "Most importantly we wanted to build a global network effect for our AI brain"; and
- "[T]he chart clearly shows the network effect, and how the machine is learning and doing a better job."

92. Other examples of Defendants Tavakkol's and Parto's misrepresentations included but were not necessarily limited to the following and/or similar statements in emails that Defendants Tavakkol and Parto and other employees of LimeSpot sent to Plaintiffs, which were also made by Defendants Tavakkol and Parto and additional LimeSpot employees on other occasions in writing and/or orally, and which were not true:

- "Our patent-pending technology uses linguistic analysis and machine learning to understand content and target it intelligently";
- "By combining that with the power of profile information (i.e. social network, CRM, loyalty programs, etc.), along with behavioral and trend analysis, LimeSpot is able to instantly make highly relevant recommendations for each consumer"; and
- "[e]ven if something is not available today, we can easily and quickly add new endpoint sand processors to deliver whatever we want."

93. Further examples of Defendants Tavakkol's and Parto's misrepresentations included but were not necessarily limited to the following and/or similar statements in an April 2017 email thread that Defendant Tavakkol sent to Plaintiff Rafer, which were also made by Defendants Tavakkol and Parto and additional LimeSpot employees on other occasions in writing and/or orally, and which were not true:

- "LimeSpot is a system of neural networks";
- "In our case, the system grows and evolves and makes marketing choices automatically – the AI learns and is always optimizing";
- "An important part of the Limestore (to be built) is an automated ad engine to use the above data to target shoppers on ads and apply machine-learning to further optimize for the lowest CAC"; and
- Unlike LimeSpot, the system of its competitor BlueKai "doesn't learn or evolve.  Its entire function is to . . . manually understand shoppers".

24

94.     Moreover, with respect to specific examples of Defendants Tavakkol's and Parto's omissions, Defendants Tavakkol and Parto actively hid LimeSpot's lack of neural network use, machine learning, and/or deep learning technology from Plaintiffs at all costs.  For instance, whenever Plaintiffs specifically asked Defendants Tavakkol and Parto about LimeSpot's purported neural networks and/or suggested making modifications to and/or re-platforming it, Defendants would strongly push back on Plaintiffs' proposals instead of coming clean and admitting that no neural networks actually existed in the first place.  Rather, Defendants Tavakkol and Parto would continue to misrepresent that LimeSpot's system of neural networks was superior to and would outperform any competitor or open-source neural networks.

95.     The representations made by Defendants Tavakkol and Parto were false and the facts omitted by Defendants Tavakkol and Parto were important.

96.     Although Defendants Tavakkol and Parto  may have honestly believed that the misrepresentations were true and/or that their omissions were not important, there were no adequate, reasonable grounds for believing they were true and/or unimportant when they were made.

97.     Defendants Tavakkol and Parto intended that Mr. Rafer, Pantastic, and various investors rely on those representations and/or omissions in financing and entering into the SPA and Incentive Plan related to the purchase of LimeSpot, and intended to induce Plaintiffs and investors into such action.

98.     Plaintiffs and various investors reasonably relied on those material representations and/or omissions, which were the central purpose of Plaintiffs' investment in and acquisition of LimeSpot.

99.     Plaintiffs' reliance on the representations and/or omissions was a substantial factor in causing Plaintiffs' harm.

100.     As a direct and proximate result of those misrepresentations and/or omissions from the very outset of the parties' relationship – including but not limited to throughout the negotiations which led to the SPA and Incentive Plan – those entire agreements never legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable.

101.     Plaintiffs were harmed in an amount to be proven at trial and are entitled to damages

including but not limited to the approximately ███████████ Pantastic already paid for the purchase of LimeSpot and all other general and special damages.

### THIRD CAUSE OF ACTION

### Unfair Business Practices; Bus. & Prof. Code § 17200 et seq.

### (Against Defendants Tavakkol and Parto)

102.    Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action. Any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

103.    Defendants Tavakkol and Parto committed acts of unfair, deceptive, and fraudulent trade practices as defined by California Business and Professions Code section 17200, et seq. by engaging in unlawful practices, including but not limited to: making false statements as to LimeSpot's technological capabilities and data and information related to same, making false statements as to their ability to develop further technology, as well as any of the aforementioned wrongdoings.

104.    As a direct and proximate cause of any of Defendants Tavakkol's and Parto's unlawful business practices or acts, Plaintiffs were harmed and continue to suffer irreparable harm to their business and reputation unless there is restitution, injunctive, and/or preventive relief.   Because Defendants are guilty of fraud and/or malice in their wrongdoing, Plaintiffs are further entitled to punitive damages. Unless and until injunctive, preventive, and/or other equitable relief is granted, Plaintiffs will be harmed, and Defendants will be unjustly enriched.

### FOURTH CAUSE OF ACTION

### Restitution/Unjust Enrichment

### (Against All Defendants)

105.    Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action. Any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

106.    Defendants received a benefit from Plaintiffs in the form of payments of a portion of the ███████████ for the sale of LimeSpot and its promised technology that was supposed to include without limitation artificial intelligence, machine learning, and deep learning capabilities that

26

utilized a system of neural networks and were automated and did not require human input and/or adjustment.   Defendants improperly retained that benefit because Pantastic did not receive the technology promised, which was the central purpose of Pantastic's acquisition of LimeSpot and induced Pantastic to enter into the SPA and Incentive Plan.

107.    Defendants were unjustly enriched by keeping the portions they were paid of the ███████████ from Plaintiffs without providing the promised technology or performing the other obligations pursuant to the SPA and/or Incentive Plan.

108.    It would be unjust to allow Defendants to retain the benefit of the aforementioned wrongdoings at the expense of Plaintiffs, such that the monies Defendants received from Plaintiffs should be disgorged to Plaintiffs.

109.    Plaintiffs are therefore entitled to restitution or disgorgement of at least an amount equivalent to the portions of the ███████████ that Pantastic paid to Defendants, and/or other associated detriment to Plaintiffs, in an amount to be proven at trial, and/or any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**

**Conversion**

**(Against All Defendants)**

110.    Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action. Any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

111.    Plaintiffs have a right to possess monies or assets in equivalent value to the payments made to Defendants under the fraudulently induced SPA, the parties' other fraudulently induced agreements, and/or Defendants' promises, and any other associated detriment at the time of conversion.

112.    The associated detriment includes but is not limited to pre-judgment and post-judgment interest from the time of conversion, or an amount sufficient to indemnify Plaintiffs for the loss caused by Defendants' wrongful acts, and a fair compensation for the time and money properly expended in pursuit of the return of paid monies due back to Plaintiffs.

COMPLAINT

113.     Defendants intentionally and substantially interfered with those monies or assets by their conduct, including but not limited to taking possession of and improperly keeping payments from the ██████████ that were gained by fraud, without performing under the SPA or providing the promised technology, as well as any of the aforementioned wrongdoings.

114.     As a result of any and all of those wrongdoings, Defendants prevented Plaintiffs from having access to those monies and assets. Plaintiffs did not consent to any of Defendants wrongdoings.

115.     Plaintiffs were harmed.

116.     Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

117.     Plaintiffs are entitled to damages in the amount of at least the portions of the ██████████ that Plaintiffs paid to Defendants, and/or other associated detriment to Plaintiffs, in an amount to be proven at trial, and/or any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants)

118.     Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action.  This cause of action is plead in the alternative to Plaintiffs' tort claims, and Plaintiffs maintain that Defendants Tavakkol and Parto have committed multiple acts of fraud on Plaintiffs as more particularly set forth above, including but not limited to intentionally omitting and/or misrepresenting material facts to Plaintiffs and investors – such as those regarding LimeSpot's promised technology – that were the central purpose of Pantastic's acquisition of LimeSpot and induced Pantastic to enter into the SPA and Incentive Plan.  As a direct and proximate result of those fraudulent misrepresentations and/or omissions from the very outset of the parties' relationship – including but not limited to throughout the negotiations which led to the SPA and Incentive Plan – those entire agreements never legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable.  Thus, any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

119.     Plaintiff Pantastic, Defendants, and other Shareholder Parties entered into an SPA and Incentive Plan related to the sale of LimeSpot to Pantastic.

COMPLAINT

120.    Defendants breached at least the SPA with Pantastic as alleged above, including but not limited to by:

- Failing to substantially complete at least eight (8) of the twenty-two (22) discrete Tasks that make up the Earn Out Criteria pursuant to § 2.4 and Exhibit F to the SPA, including without limitation Tasks 2.1, 2.5, 2.6, 2.7, 2.8, 3.4, 3.5, and 3.6, despite extensive and detailed written explanations and feedback by Pantastic regarding why those Tasks had not been accepted and multiple extensions;

- Failing to provide a neural network and machine and deep learning system as consistently promised that was automated and did not require numerous and frequent human input and/or adjustments;

- Failing to work in good faith to facilitate the progression on the Earn Out Milestone pursuant to Exhibit F to the SPA, including but not limited to by refusing to work cooperatively with Pantastic, failing to respond to Pantastic's requests and comments, and refusing to listen to Pantastic's feedback and instructions; and

- Failing to comply with the specific procedures for submitting Tasks for approval by Pantastic and/or escalating rejected Tasks that LimeSpot believed should have been accepted pursuant to Exhibit F of the SPA.

121.    As a result of the fraudulent misrepresentations and/or omissions, and contractual breaches by Defendants, Defendants must ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████

122.    Pantastic has performed all or substantially all covenants, conditions, and obligations to be performed by it under the SPA, except to the extent excused, waived, or made impossible or impractical by Defendants' conduct and fraudulent misrepresentations and/or omissions.

123.    Pantastic has been, and continues to be, damaged as a direct and proximate result of the failures by Defendants to comply with terms of the SPA and does not owe any payments to Defendants, including without limitation the Earn Out Payment.

124.    Pantastic was harmed in an amount to be proven at trial and is entitled to damages

_____

including but not limited to the approximately ██████████ Pantastic already paid for the purchase of LimeSpot and all other general and special damages.

## SEVENTH CAUSE OF ACTION

### Breach of Covenant of Good Faith and Fair Dealing

### (Against All Defendants)

125.    Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action.  This cause of action is plead in the alternative to Plaintiffs' tort claims, and Plaintiffs maintain that Defendants Tavakkol and Parto have committed multiple acts of fraud on Plaintiffs as more particularly set forth above, including but not limited to intentionally omitting and/or misrepresenting material facts to Plaintiffs and investors that were the central purpose of Pantastic's acquisition of LimeSpot and induced Pantastic to enter into the SPA and Incentive Plan. As a direct and proximate result of those fraudulent misrepresentations and/or omissions from the very outset of the parties' relationship, those entire agreements never legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable.  Thus, any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

126.    As noted above, Defendants were bound by the SPA and Incentive Plan to perform under the contracts in exchange for payment.

127.    Plaintiff Pantastic has performed all or substantially all covenants, conditions, and obligations to be performed by it under its contracts with Defendants, except to the extent excused, waived or made impossible or impractical by Defendants' conduct.

128.    Pantastic also agreed to multiple extensions for the Earn Out Milestone in writing and/or verbally, in addendum to and/or separate from the SPA and Incentive Plan.  Additionally, during the parties' course of dealings and course of conduct, Defendants frequently promised that they could complete the Earn Out Criteria on time and were making progress toward doing so.  After the expiration of the Earn Out Period and after Plaintiffs discovered Defendants Tavakkol's and Parto's many fraudulent misrepresentations and/or omissions, Defendants further promised for an approximately six (6) month period that they would work with Plaintiffs in good faith to negotiate

COMPLAINT

1   and revise the Earn Out Criteria in a way that would at least allow Pantastic to obtain some value

2   from LimeSpot's technology, albeit not the essential capabilities repeatedly promised.

3          129.    Among other things, and on information and belief, Defendants Tavakkol's and

4   Parto's false promises regarding LimeSpot's technology, and Defendants' false promises regarding

5   the ability to both perform and meet deadlines, multiple extensions, and Defendants' willingness to

6   negotiate in good faith and revise the Earn Out Criteria formed part of a plan to continue to attempt

7   to collect payments under the SPA and Incentive Plan, but without performing in accordance with

8   the contracts, the parties' other agreements, and/or Defendants' promises.

9          130.    Relying on Defendants' reassurances and promises, Plaintiffs had no choice but to

10  tolerate Defendants' multiple deadline delays and Pantastic continued to perform under the

11  contracts.

12         131.    Defendants failed to uphold their end of the bargain and breached the covenant of

13  good faith and fair dealing, including but not limited to by Defendants Tavakkol and Parto

14  frequently making false promises that LimeSpot utilized artificial intelligence, machine learning, and

15  deep learning technology that utilized a system of neural networks and was automated and did not

16  require human input and/or adjustment, that Defendants could complete the Earn Out Criteria on

17  time and were making progress toward doing so, and that Defendants would negotiate in good faith

18  and revise the Earn Out Criteria after Plaintiffs discovered the many fraudulent misrepresentations

19  and/or omissions.  By doing so, Defendants also induced Plaintiffs to delay the pursuit of claims

20  against Defendants, including without limitation to terminate, invalidate, or void the SPA and

21  Incentive Plan by continually representing that LimeSpot had the promised technology, that

22  Defendants were performing and could continue to perform under the SPA and Incentive Plan, and

23  that Defendants would negotiate in good faith.

24         132.    As a result of Defendants' lack of good faith, not only has Pantastic suffered losses

25  through payments to Defendants for technology it did not receive, but it also incurred substantial

26  opportunity cost where its resources and efforts could have been redirected to other companies who

27  could have created and/or delivered machine and deep learning technology in a quick and cost

28  efficient manner, or allocated to further develop Pantastic's business.

133.    Pantastic was harmed by Defendants' breaches of the covenant of good faith and fair dealing.

134.    Defendants' breaches were a substantial factor in causing Pantastic's harm.

135.    Pantastic is entitled to general and special damages, including but not limited to the approximately ███████████ Pantastic already paid for the purchase of LimeSpot, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Promissory Estoppel

### (Against All Defendants)

136.    Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action.  This cause of action is plead in the alternative to Plaintiffs' tort claims, and Plaintiffs maintain that Defendants Tavakkol and Parto have committed multiple acts of fraud on Plaintiffs as more particularly set forth above, including but not limited to intentionally omitting and/or misrepresenting material facts to Plaintiffs and investors that were the central purpose of Pantastic's acquisition of LimeSpot and induced Pantastic to enter into the SPA and Incentive Plan. As a direct and proximate result of those fraudulent misrepresentations and/or omissions from the very outset of the parties' relationship, those entire agreements never legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable.  Thus, any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

137.    Defendants made multiple clear and unambiguous promises, including but not limited to Defendants Tavakkol and Parto representing that LimeSpot had artificial intelligence, machine learning, and deep learning technology that utilized a system of neural networks and was automated and did not require human input and/or adjustment, that Defendants could complete the Earn Out Criteria on time and were making progress toward doing so, and that Defendants would negotiate in good faith and revise the Earn Out Criteria after Plaintiffs discovered their many fraudulent misrepresentations and/or omissions.

138.    In so representing, Defendants knew or should have known that Plaintiff Pantastic would be reasonably induced to rely upon those representations, contract with Defendants, pay for

the purchase of LimeSpot, and avoid terminating, invalidating, and/or voiding the SPA and/or

Incentive Plan and entering into an agreement with another company that could have created and/or

delivered machine and deep learning technology in a quick and cost-efficient manner.

139.    Pantastic did reasonably and justifiably rely on those representations when

contracting with Defendants, paying for the purchase of LimeSpot, and repeatedly withholding from

terminating, invalidating, and/or voiding the contracts and entering into an agreement with another

company.  Despite their agreements, Defendants continually failed to provide the contracted for

technology and/or substantially complete the Earn Out Criteria, meet deadlines even after

unilaterally and repeatedly delaying them, and negotiate in good faith to revise the Earn Out Criteria

after Plaintiffs discovered their many fraudulent misrepresentations and/or omissions.

140.    As a substantial factor, the reliance on Defendants' conduct has harmed and continues

to cause harm to Pantastic.

141.    Pantastic is therefore entitled to damages in an amount to be proven at trial, including

without limitation the approximately ████████████ Pantastic already paid for the purchase of

LimeSpot and/or any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION

### Money Had and Received

### (Against All Defendants)

142.    Plaintiffs hereby incorporate by reference all paragraphs and allegations above to the

extent necessary to state a cause of action. Any allegations herein inconsistent with prior allegations

are explicitly intended to be pled in the alternative.

143.    Defendants received significant monies from Plaintiff Pantastic including but not

limited to related to the purchase of LimeSpot by Pantastic; thus, the monies were given with the

intent that they would benefit Pantastic.

144.    The monies given did not benefit Pantastic; indeed, Pantastic paid the monies to

Defendants pursuant to the SPA and/or Incentive Plan that never legally came into being, and/or are

wholly invalid, illegal, void, rescinded, and/or unenforceable contracts entirely tainted by fraud.

145.    The monies Pantastic paid Defendants should therefore be returned and/or disgorged.

### **TENTH CAUSE OF ACTION**

### **Declaratory Judgment**

### **(Against All Defendants)**

1.     Plaintiffs Pantastic and Neil S. Rafer hereby incorporate by reference all paragraphs and allegations above to the extent necessary to state a cause of action. Any allegations herein inconsistent with prior allegations are explicitly intended to be pled in the alternative.

2.     Defendants, by and through their actions, including but not limited to Defendants Tavakkol and Parto making numerous misrepresentations and/or omissions regarding LimeSpot's technological capabilities and related data and information, Defendants Tavakkol's and Parto's fraudulent inducement of contracts, Defendants' failure to deliver promised technology or substantially complete the Earn Out Criteria, and Defendants' failure to act in good faith, have created an actual controversy between Pantastic and Defendants regarding whether the SPA and Incentive Plan ever legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable, and the parties' respective rights and obligations related to the SPA and Incentive Plan.

3.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and California Code of Civil Procedure § 1060, this Court may declare the rights and other legal relationships of the parties and may order such other relief as may be necessary.

4.     Plaintiffs believe in good faith that: (i) the SPA and Incentive Plan never legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable; and (ii) Defendants owe Pantastic all monies paid under the agreements related to the purchase of LimeSpot by Pantastic, which total at least ███████████.

5.     Alternatively, if the Court does find the SPA and Incentive Plan are valid and enforceable, Plaintiffs believe in good faith that: (i) the Earn Out Criteria have not been substantially completed; (ii) LimeSpot has not achieved the Earn Out Milestone; (iii) Defendants are not owed the Earn Out Payment or any payments under the Incentive Plan; and (iv) Defendants owe Pantastic all fees, costs, and losses, including without limitation those ██████████████████████, in amounts to be proven at trial.

6.     Accordingly, Plaintiffs seek a declaration as follows:

34

COMPLAINT

a) That the SPA and Incentive Plan are invalid and unenforceable in their entirety;

b) That Defendants owe Pantastic all monies paid under the agreements related to the purchase of LimeSpot by Pantastic, which total at least ███████████; and

c) That Pantastic does not owe any other monies under the invalid and unenforceable SPA and/or Incentive Plan.

7.    Alternatively, if the Court does find the SPA and Incentive Plan are valid and enforceable, Plaintiffs seek a declaration as follows:

a) That the Earn Out Criteria have not been substantially completed;

b) That LimeSpot has not achieved the Earn Out Milestone;

c) That Defendants are not owed the Earn Out Payment or any payments under the Incentive Plan; and

d) That Defendants owe Pantastic all fees, costs, and losses, including without limitation those ███████████████, in amounts to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

1.  For a Judgment declaring that:

a) The SPA and Incentive Plan never legally came into being, and/or are wholly tainted, invalid, illegal, void, rescinded, and/or unenforceable;

b) Defendants owe Pantastic all monies paid under the agreements related to the purchase of LimeSpot by Pantastic, which total at least ██████████; and

c) Pantastic does not owe any other monies under the invalid and unenforceable SPA and/or Incentive Plan.

2.  Alternatively, for a Judgment declaring that:

a) The Earn Out Criteria have not been substantially completed;

b) LimeSpot has not achieved the Earn Out Milestone;

c) Defendants are not owed the Earn Out Payment or any payments under the Incentive Plan; and

35

COMPLAINT

d)  Defendants owe Pantastic all fees, costs, and losses, including without limitation those ███████████████████████, in amounts to be proven at trial.

3. Actual and compensatory damages in an amount to be determined, including without limitation the approximately ████████████ Pantastic already paid for the purchase of LimeSpot;

4. An accounting to establish, and an order requiring restitution and/or disgorgement of, any and all sums by which Defendants have been unjustly enriched;

5. Punitive damages;

6. All fees and costs, including without limitation those ███████████████ to the extent the agreement is enforceable;

7. All losses sustained or incurred ████████████ to the extent the agreement is enforceable;

8. For interest as provided by law; and

9. For such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiffs hereby demand trial by jury of all claims and issues alleged in this Complaint that are triable by a jury.


Dated:  April 7, 2023                    HOLLAND LAW LLP


                                         _____*/s/Christopher T. Holland*_____
                                         Christopher T. Holland
                                         Attorneys for Plaintiffs
                                         RETAILERX, INC. D/B/A PANTASTIC NETWORKS
                                         and NEIL S. RAFER

COMPLAINT